The next case today is Annie Zhao v. CIEE, Inc. et al., Appeal No. 20-1878. Attorney Schutz, please introduce yourself for the record and proceed with your argument. Thank you. May it please the Court, my name is Sigmund Schutz. I represent Appellant Annie Zhao. This is a case of study abroad minus the abroad. College students had their study abroad programs cancelled by CIEE and they returned home, but CIEE kept 100% of the money they paid, both tuition and room and board. The District Court erred by ruling that CIEE had a right to do this as a matter of law. CIEE agreed in paragraph 14 of its contract with students, in the unlikely event that a program is cancelled due to low enrollment or any other reason, CIEE will refund all payments received but will have no further liability to participant. This is a clear obligation to provide a refund in the event of program cancellation. In March of 2020, CIEE cancelled its study abroad programs and sent all the students home. CIEE, therefore, is contractually obligated by paragraph 14 to provide a refund. But even without paragraph 14, the heart of CIEE's service was study abroad, not study from home by Zoom. By not providing that overseas experience, what CIEE describes as life-changing, and cancelling student housing, CIEE is obligated to provide a refund. And I'd like to address the three key issues in this appeal, paragraph 14, the terms and conditions, and what I'll refer to as the exculpatory clauses in the contract that CIEE relied on. Paragraph 14 is specific and applies squarely to the circumstances here. It's specific because it deals narrowly with cancellations and refunds. It requires that CIEE provide refunds for programs cancelled for any reason. It also says that CIEE will have no further liability to participant beyond a refund. That is, participant's sole remedy per paragraph 14 is a refund for the consideration they paid to CIEE for tuition and room and board. This is Igby. Was your client able to get academic credit for this experience? My client was able to get some of the original academic credit, but not all of the academic credit. This isn't in the record, but she did drop a class that relied heavily on in-person physical activities in Europe, and that wasn't feasible, really, to continue with via Zoom online. But there's no question that students going to CIEE... Was that other course associated with this program, or was that something that she just did on her own? That was associated with this program. And I think if we were to consider all the class members, you're going to have class members that may have decided for various reasons to drop out of a class, say, taking Dutch, or visiting museums and pursuing art history, or liaisoning with doing study that would require in-person experience in those foreign countries. But there's no question that students who go on these CIEE programs go to them not just for academic credit. This isn't just a question of, you know, I need a certain number of credits to graduate. This is about being in the foreign country, living there, the cultural immersion that comes with being abroad. I mean, that's 90 percent of what studying abroad is all about. It's actually being physically there, not watching a movie about living there or participating in Zoom instruction with professors that are located overseas. It's actually the experience of living and life in that country. And that's what CIEE touts. That's the whole raison d'etre of their program. That's in their name. The district court was obligated to read the contract as a whole. How do you reconcile the Provision 14 with the pandemic provision? Or how would you like us to reconcile it? Well, if those provisions are at odds with Paragraph 14, that would be an ambiguity. I mean, if they are in direct conflict, that would be an ambiguity, and that would be the jury's job to figure out. Those exculpatory provisions don't mention refunds. And that term refund is used by CIEE throughout its contract to describe a variety of circumstances. All we're seeking is a refund limited to the tuition and room and board that was paid. Those exculpatory clauses may bar recovery of any other costs or expenses that students may have incurred in returning home, securing additional credits, or other types of consequential remedies. But those paragraphs don't refer to refunds. And CIEE agreed, and in its brief it says on page 22 of its brief, it agreed that it must provide refunds if a program is canceled before the start date. So CIEE itself is conceding that there has to be a reconciliation of those exculpatory clauses with its obligation to provide a refund. What those clauses do and what Paragraph 14 itself says is there's no further liability to participant beyond a refund, but CIEE's got to provide a refund where there's a cancellation. There is a provision in the Terms and Conditions that addresses cancellation after the program starts, correct? Yes, there is a paragraph. And your client did start her program, correct? Yes. And that provision in the Terms and Conditions also provides that when the program is canceled after it starts, CIEE's obligation is to make reasonable efforts to allow the participant to complete the academic coursework. That's what that provision provides, right? Yes, it does. And there is no allegation in the complaint that CIEE breached that provision, correct? That's correct. So I guess the question is where is the breach of contract given the Terms and Conditions and the fact that there is also the exculpatory clauses, as you call them, where your client releases CIEE from liability or damages due to pandemics? Well, again, paragraph 14 is specific as to cancellation and refunds. Those exculpatory clauses don't address those circumstances. But as to the Terms and Conditions, we read those to be consistent with the obligation to provide refunds. That is, CIEE had two obligations in the event of cancellation. One, it's got to make some arrangements or try to make arrangements to provide alternative credit. But just as if a student were staying at a hotel that canceled lodging, the hotel might undertake an obligation to provide alternative lodging for its guests. But if that alternative lodging is less valuable than the originally promised lodging, the hotel would still have an obligation to provide a refund for the difference in value of the services or the accommodations provided. I was going to make an analogy about students staying at the Ritz-Carlton and ending up at the Motel 6. Of course, student housing isn't the Ritz. But what students actually had was a promise of housing, and they ended up with nothing. CIEE had two obligations. One, to make reasonable efforts to try to get them credit. And second, to make a refund as it promised. Those obligations are not in conflict. And the Terms and Conditions that deal with cancellation after a program has begun are silent on the subject of refunds. Therefore, we can look to Paragraph 14 and interpret those together to provide two, not contradictory but compatible obligations on CIEE's part to provide to students a remedy or at least reimbursement for the portion of housing that CIEE didn't provide and also for the difference in value between an educational experience by Zoom and a live, in-person, international, culturally immersive experience in a foreign country, which is what they promised to provide. What is the amount of the refund of all payments under 14 in this scenario? I don't mean the dollar amount, but is it all payments received? Is it proportionate? We would look at it not necessarily as an all payments. We treat it like an impracticability or impossibility situation where CIEE has a good reason not to continue with the program due to the pandemic, but then there's got to be an offset for the value of what CIEE did, in fact, provide. It provided, in Zhao's case, about 40% of the housing that they originally were anticipated to provide, and so about 40% of the in-person instruction. So CIEE would be entitled to some equitable apportionment. Similar to what the law would provide if there were no contract and there was just a deal and an act of God or a pandemic or some other catastrophe occurs that excuses one side from providing the services, but obviously under the law that side doesn't get to retain all the consideration paid. And the students pay 100% of the consideration in advance before they are able to participate in the program. So CIEE gets 100% of the consideration up front, and then there's a question, well, look, a circumstance has arisen that makes the program no longer feasible to continue, and then there's got to be an equitable and fair reapportionment between CIEE and students. Now, so the first sentence in paragraph 14 reads, all CIEE programs are based on group arrangements involving a minimum number of participants. To me, that seems to suggest that what follows the first sentence has to do with them being able to assemble a group in the first place to allow that group to go forward and that in the event they're unable to assemble, that to me suggests that a participant who's already paid would be entitled to a full refund, but the full refund is limited to the inability to assemble a group. Your Honor, we would be kind of dead in the water on this argument, but for the fact that CIEE put in parentheses for a low enrollment or any other reason, and that's CIEE's own language in their own contract. So they've broadened out that obligation, whether they may have goofed, but if they goofed, that's on them. Most consumer contracts are totally one side in favor of one side or the other. In this instance, if CIEE made a mistake and somebody wrote into that contract in parentheses for any other reason or if someone made a mistake, that's on CIEE because this is a contract of adhesion. It should be construed in favor of the students who are obviously in an inferior bargaining position or faced with a take-it-or-leave-it deal from CIEE, but the way they drafted paragraph 14 and what they included in those parentheses, I think is very problematic for CIEE in making the point, although I think I completely agree with Your Honor, that but for the language in that parentheses and but for any other reason language, they would have a reasonable argument to make that this is not intended to apply to a program that's canceled after the start date. I do want to address the fact that the exculpatory clauses that CIEE is relying on, if interpreted broadly as CIEE contends, would render nugatory other obligations CIEE undertook in the contract, including the very obligation that Judge Arias mentioned, which is to provide alternative arrangements. If CIEE was completely off the hook under paragraph 18 and 19 for doing anything, they would also be off the hook from providing the alternative arrangements to allow students to obtain academic credit. CIEE also says on page 22 of their brief that they agree that they must provide a refund if a program is canceled before a program starts. So once again, CIEE is saying that there's got to be a reconciliation between these exculpatory clauses and paragraph 14 and otherwise the obligation that they undertook to provide a refund. We also point out that if these exculpatory clauses are interpreted as broadly as CIEE contends, that would raise penalty, liquidated damages, and unconscionability problems. We're not making a direct frontal attack on those clauses as unenforceable. What we are arguing is they should be interpreted in a way that would avoid creating those kinds of problems. This has come up in a couple of cases in Maine where tuition or similar types of fees have been charged and institutions have had strict no-refund policies, and Maine courts have found those kinds of strict no-refund policies problematic. In the Pacheco case, which we cited and the district court doesn't mention, the Maine SGC held that an express contractual no-refund policy was an unenforceable liquidated damages clause. That case involved a high school student who withdrew from a Maine summer camp to go to summer school because he flunked his Spanish final. The court noted that in one clause in the contract, it was specified that if a notice of a camper's withdrawal was received after a deadline, the amount paid to the camp up to the time of receipt of the notice would be retained, an express no-refund clause. The Maine Supreme Court said no. That was a liquidated damages clause and unenforceable. Judge Lopez, while he was serving on the Maine Superior Court, reached a similar conclusion in Miller v. Kent's Hill. That case involved an express no-refund policy. Judge Lopez held that under Maine law, that was an unenforceable penalty. In that case, the student was expelled from a boarding school in Maine for using drugs. The school had an express no-refund policy, but Judge Lopez required that the school make a full refund. He found that the Pacheco case effectively requires that an institution like CIE only recover to the extent of its actual damages, its actual loss. Alternatively, it's got to show that it can't prove what the loss is and go through the usual liquidated damages analysis. Let me stop you there, Mr. Schutz. Judge Thompson, Judge Arias, questions? I was just asking Mr. Sigman if he plead what he's arguing now. We didn't plead that, but we raised it in opposition to the arguments that CIE raised in their 12B motion. In other words, we weren't making a frontal attack on any of these provisions as unenforceable. We were just taking the position once CIE raised them, if it's for CIE to prevail, it's got to jump through the hoops necessary to enforce those under Maine law, and those provisions should be construed narrowly to avoid creating those problems. Thank you. All right, thank you. You've reserved some time. If you would mute your device. Mr. Higgins. Good morning, Your Honors. Chad Higgins for the Pelley CIEE. May it please the court. Mr. Schutz's presentation, I believe, focuses directly on the issue that's before the court. It's the interplay between Paragraph 14 of the participant contract and the terms and conditions that's in the program cancellation provisions and the terms and conditions. When you read all three of those provisions together, you'll see that there is a temporal limitation that divides the top paragraph of the program cancellation provision and the bottom paragraph of the program cancellation provision. Paragraph 14 directly relates to a pre-start cancellation. The exact same language in Paragraph 14 is present in the first paragraph. All CIEE programs are based on group arrangements involving a minimum number of participants, and it goes on to say that, in the unlikely event a program is canceled prior to its start, due to low enrollment or any other reason, there will be a refund. So in the circumstance where a cancellation occurs prior to the start of the program, the risk of loss is on CIEE, and participants would be entitled to a refund. The next paragraph. What is the point? Because it seems to me that you could have just stopped due to low enrollment, but instead you have inserted or any other reason. I mean, what is that supposed to mean? And once again, this is your contract, and to the extent that we might think that there are ambiguities, it's going to be construed against you. Yes, Your Honor. Paragraph 14 is the mirror language of the first provision, and that first provision is about pre-start cancellations. But it isn't mirror language. The exact same language from paragraph 14 of the participant contract is in the terms and conditions paragraph, first paragraph of the program cancellation provision. There is other language that is there in that first paragraph, Your Honor, if that's what you're referring to. Yes. Yeah, prior to the start of the program, right. So the prior to the start of the program informs the paragraph 14 requirement that a refund would be given if the cancellation happens before. We're obligated under the rules of contract interpretation to give meaning to all the different terms, and how we give meaning to all the different terms in this contract is paragraph 14 relates to a pre-start cancellation. The second paragraph of the program cancellation provision governs the obligations of CIEE if a program is canceled after its start. So the program cancellation provision encompasses the entirety of the obligations for CIEE, and it makes a temporal distinction between pre-start and post-start. And in the second paragraph of the program cancellation provision, it says if an emergency requires the program to be canceled following the start date, and then it details CIEE's obligation to pursue academic credit for the participants. Those are the exact facts that are presented by this matter before the court. The program started in the Netherlands. The coronavirus interrupted the program, caused CIEE to cancel the study abroad portion, and the second paragraph governs the obligations of CIEE in that circumstance, and CIEE fulfilled those obligations. Now, Mr. Schutz raised the issue. Paragraph 14 is that it doesn't say in the unlikely event that a program is canceled pre-start date. It does not, Your Honor, but the language mirrors the beginning of the program cancellation provision, and we have to look at the contract as a whole, and we have to interpret them in as mutually consistent manner as possible. So it amplifies the obligation of paragraph 14. The first paragraph of the cancellation provision amplifies the obligation of paragraph 14, and the temporal difference is if after the start date an emergency triggers the second provision, which is what happened in this matter, then the liability waiver provisions that Mr. Schutz discussed are triggered. Those are paragraphs 18, 19, and 23, all of which account for varying emergencies that could cause, and in this instance did cause, CIEE to cancel the study abroad portion. So these provisions taken as a whole and interpreted in a way that seeks to make them mutually consistent does not render this contract ambiguous, and that's what the district court found, is that these provisions taken as a whole are reconciled and not ambiguous, and therefore, as a matter of law, plaintiff failed to state a claim. Moving to the relationship between paragraph 14 and the exculpatory provisions, as Mr. Schutz called them, paragraphs 18, 19, and 23. Just in that first section that you were referring to, that in part mirrors 14, where if an emergency requires that a program be canceled following the program's start date, what does alternative arrangements mean there? Is that defined in the document? I do not believe it is, Your Honor, and I think the alternative arrangements contemplated by that provision would vary according to the program, depending on the circumstances. The term reasonable efforts to make alternative arrangements in order for the students to receive credit, I think covers all manner of arrangements that CIEE might undertake. Might that include a partial refund?  It's a binary position, and it's an assignment of risk of loss, so if the cancellation happened prior to the start date, there is specific mention of a refund. In the next paragraph, which governs a situation caused by an emergency that happens after the start date, there's no mention of refund. Well, there's reasonable efforts to make alternative arrangements, and I'm asking you what the definition of alternative arrangements is, and could that include making a refund, which might permit somebody to enroll somewhere for partial credit, et cetera? I don't think that's a fair reading of the language. So refunds are excluded by this language that doesn't mention refunds? In the circumstances of the second paragraph of the program cancellation provision, yes, CIEE's obligation is to make alternative arrangements for the student and participant to receive credit, and it's not obligated to provide a refund in that circumstance. That wasn't my question. My question was whether alternative arrangements could include as a possibility refund or partial refund. You're saying it can't, and I want to know why. I don't believe if read in context with the remainder of the paragraph that that's a fair interpretation of the term as it's used there. Well, okay, you don't believe it's fair, but tell me why. Because the entirety of the paragraph speaks to when an emergency triggers alternative arrangements needing to be made, and the remainder goes on to speak about receiving credit, getting credit. If the parties had intended for that provision to apply to have alternative arrangements include a refund, they could have used the word refund there. But first you told me that it would include any broad range of mechanisms that would allow for the students to complete their academic work. But the one thing you want to exclude from that is a cash payment. I think that's the only fair interpretation of the language that's provided in the contract, Your Honor, is that the contract itself speaks to the efforts that CIEE is obligated to undertake under these circumstances, which is to pursue academic credit for the participant. And when paragraph two of the program cancellation provision is triggered, Your Honor, the risk of loss is detailed in paragraphs 18, 19, and 23, which account all the different emergency situations that may arise and that the risk of loss is on the participant, not on CIEE in those circumstances. Turning to Mr. Schutt's argument regarding... Well, no way. But when you say risk of loss, you're saying that that includes, that that's a broad term, meaning any possible money that they might otherwise be owed under any other provision. Is that how you're interpreting that? It's not a forward-looking provision? Read in context. No, Your Honor, I don't believe it is a forward-looking provision. And read in the context of the other clauses that Mr. Schutt's mentioned, 18, 19, and 23. They use the language used in the contract is loss, assume all risk, and hold harmless. It's clear taking all those provisions in context and together that the risk of any emergency, other than seeking to get academic credit for the participant, is on the student in those circumstances. Paragraph 14 is informed by the first paragraph of the cancellation policy. An emergency situation then triggers CIEE's other enumerated obligation and the risk of any kind of financial loss or any other circumstances where there may have been injury or other types of claims that come about are covered by 18, 19, and 23. Can I ask you a question? And I know this may not be presented by the case, but I'm sure you've thought about it. So if the program gets canceled the day after it starts and the tuition room and board has all been paid up front, it's gone? It is, Your Honor. And Paragraph 18 addresses that because it demonstrates that CIEE is a pass-through organization and has to make all of its arrangements ahead of time with its vendors. It doesn't own or operate any of the facilities or experiences that it's seeking to secure for the students. So it is a fair line of demarcation that the risk of loss prior to the start is on CIEE, whereas after the start date, the risk of loss is on the student because CIEE has made those prearrangements for all of the semester ahead of schedule. But it doesn't say there will be no refunds. Paragraph 18, does that say that? No, but it does say, without limitation, CIEE is not responsible for any injury, loss, or damage to person, property, death, or inconvenience in connection with the provision of any goods or services occasioned by, resulting from, and not limited to, acts of God, force majeure, acts of government, academics, or threat thereof, or for any cause beyond the direct control of CIEE. It's an intentionally very broad use of language there that covers, I would argue, covers the loss opportunity that Ms. Zhou has alleged in her complaint. You have a minute or two left. Thank you, Your Honor. Which brings me to Mr. Shute's third point, which is this was a study abroad without the abroad, but that speaks directly to the loss provisions that we've been discussing for the last few moments, 18, 19, and 23, speaking about loss, all risk, and the hold harmless provision. It is the line of demarcation where the risk switches from CIEE to the participant. And that's fair because the line has to be somewhere in order for these programs to be arranged and in order for CIEE to make the arrangements ahead of time. This contract, unlike many contracts that have come up in the past year, actually accounts for the specific facts that are alleged in plaintiff's complaint with regards to the fact that the program was canceled post-start date. There was an emergency that caused CIEE to seek alternative arrangements to provide for the participant to receive credit and then also assigns the risk of loss directly in those paragraphs 18, 19, and 23. Other questions from the court? No. Thank you very much, Mr. Higgins. Thank you very much to the panel. Mr. Schutz, you want to... There you go. Thank you, Your Honor. With regard to the second paragraph under program cancellation, not only could CIEE, as part of alternative arrangements, provide a cash payment to students, CIEE could, under that provision, charge students for those alternative arrangements. CIEE could go to students and say, look, we had to cancel your program in Amsterdam to set up an alternative program so you can finish your credits. That's going to be another $1,000. We charged you this amount. I mean, CIEE can come up with an entirely new arrangement. That paragraph doesn't address the financial terms of those alternative arrangements, nor, of course, does it address the question of a refund or compensation for unprovided services abroad or room and board. So CIEE can, under that paragraph, make an entirely new offer, and I would suggest that would have been the most fair thing for CIEE to have done, to have said, look, unfortunately, we had to cancel these programs. We've got to provide what we can by Zoom. We realize that's a far cry from what you bargained for, what was anticipated, living abroad and having these experiences all over the world that you hoped for. And, you know, here are the arrangements. And then students would have had the opportunity at that point to accept or not that new deal that CIEE could have offered. And if it was unacceptable, CIEE could have refunded the students' money. This was a worldwide pandemic. Correct. There would be no abroad experiences that could have been provided. All of these programs got canceled all over the world. Right, right. So CIEE can either go to remote learning. CIEE could go to some kind of in-person instruction back in the U.S. I mean, there may be any number of arrangements possible or not possible. In some programs, it wasn't possible to replicate the coursework that was offered abroad, and students were left high and dry or to drop those programs and not be able to receive that type of credit. And the bottom line here is this is not a well-drafted contract. The terms and conditions are not well-drafted. They don't align well with the contract. There's ample ambiguity throughout these documents in trying to reconcile how they work and don't work. We would argue that the paragraph 14 on its face, the relevant sentence, is clear and unambiguous, but I don't want to set the bar too high to prevail in this appeal. All we've got to show is that this is ultimately sorting out the intentions of the parties and, frankly, the intentions of the consumer, because this is a contract of adhesion, are given more weight. But figuring out the intention of the parties really is the job of the fact finder. And the district court judge ultimately substituted the court's judgment for the judgment ultimately of the fact finder, given these conflicting provisions that really don't link well together, lots of undefined terms, and provisions pointing potentially in different directions. Thank you, Mr. Schutz. Thank you to all counsel. Thank you. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the meeting.